**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MARVIN ANTON BOXDORFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-CV-0109-DFH-JMS |
| | ) | |
| THRIVENT INVESTMENT | ) | |
| MANAGEMENT, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THRIVENT FINANCIAL FOR | ) | |
| LUTHERANS, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff, Marvin Anton Boxdorfer (hereinafter "Tony" or "Mr. Boxdorfer"), by counsel, amends his Complaint, as of course, pursuant to the provisions of Rule 15(a) of the Federal Rules of Civil Procedure and Local Rule 15.1 as follows:

### THE PARTIES

1.      Plaintiff Marvin Anton Boxdorfer lives at 1213 N. Franklin Road, Greenwood, Indiana 46143.

2.      Defendant, Thrivent Financial, is a fraternal benefit society organized under the laws of the State of Minnesota, and conducts a securities brokerage and broker dealer business under the name Thrivent Investment Management Incorporated, with its headquarters located at 625 4th Avenue South, Minneapolis, Minnesota, 55415-1665.  It has a local office in Fort Wayne, Indiana.

3.      All acts complained of below occurred in the State of Indiana, County of

Marion.


**FACTS OF THE CASE**

4.      From January 2001 until June 1st, 2007, Mr. Boxdorfer was the managing

partner for the entire states of Indiana, Kentucky and Cincinnati for Thrivent.

5.      As managing partner, Mr. Boxdorfer was directly responsible for the

management of three branch offices and approximately 75 to 85 financial

consultants.

6.      Mr. Boxdorfer's management responsibilities included, but were not

limited to, retention and recruitment of financial consultants, increasing

productivity of financial consultants, and increasing revenues of the region.

7.      On or about January 1, 2007, Mr. Boxdorfer became disenchanted with his

current employer and began to actively seek new employment.

8.      Thrivent became aware of Mr. Boxdorfer's desire to leave and in

retaliation subjected him to an audit of his financial records.

9.      As part of this audit, Thrivent alleged several irregularities in Mr.

Boxdorfer's accounting practices.

10.     Thrivent indicated that it would be required to report these irregularities on

Mr. Boxdorfer's U-5 document and submit its information to the Financial

Industry Regulatory Authority (FINRA).

11.     Any report made on a U-5 is subsequently added to a broker's permanent

record and is publicly available.

12.     Mr. Boxdorfer denied any irregularities and tendered his resignation on May 31, 2008. *See* Exhibit A.

13.     Thrivent filed a U-5 termination document with FINRA indicating that Mr. Boxdorfer had violated Thrivent firm policy. *See* Exhibit B.

14.     Upon receipt of the U-5 document, FINRA immediately inserted a disclosure event on Mr. Boxdorfer's permanent record.

15.     In addition, FINRA launched an investigation into the allegations made by Thrivent against Mr. Boxdorfer.

16.     As part of this investigation, Thrivent made several additional untrue and unsupported allegations.  These allegations included:

   a.     That Mr. Boxdorfer used Thrivent funds without authority to pay for personal expenses.  Specifically, that Mr. Boxdorfer used Thrivent funds to pay for mortgage payments on his condominium.

   b.     That Mr. Boxdorfer improperly authorized $15,000.00 to be paid to Wells Fargo Bank for the personal mortgage of Dennis Herman.

17.     These new allegations being put forward to FINRA were particularly distressing to Mr. Boxdorfer, especially as it related to Mr. Herman.  The issue of Mr. Herman's payments had been determined to be an error made by Wells Fargo and Thrivent months before Mr. Boxdorfer's resignation.  To now accuse Mr. Boxdorfer of improperly authorizing those payments could only been seen as an attempt by Thrivent to destroy Mr. Boxdorfer's career.

18.     While being investigated by FINRA, Mr. Boxdorfer was approached by several other broker dealers regarding management positions.   These broker

dealers included Guardian Life Insurance Company of America, John Hancock Life Insurance Company, Axa Insurance Company, New England Life Insurance Company, Securian Life Insurance Company, One America Life Insurance Company, and Jefferson Pilot Financial Insurance Company.  In addition, Mr. Boxdorfer reached out to several brokerage firms regarding employment.

19.     In each instance where Mr. Boxdorfer was approached or where he sought employment in the financial field, he was ultimately rebuffed and denied an opportunity, due to the pending investigation by FINRA.

20.     Finally on March 11, 2008, FINRA made a finding that the allegations made against Mr. Boxdorfer were unfounded.

21.     On May 16, 2008, after the findings by FINRA, Mr. Boxdorfer was hired by The Guardian Life Insurance Company and Park Avenue Securities.

22.     Mr. Boxdorfer was out of work for about a year.  During this time, he lost personal income of $250,000.00.

23.     Due to the unfounded allegations by Thrivent and his forced unemployment, Mr. Boxdorfer lost significant reputation in the financial industry that has a wide-ranging impact on his current abilities to recruit.

FAILURE TO PAY BONUS

24.     On or about June 25, 2002, Mr. Boxdorfer and Thrivent executed a written Managing Partner Employment Agreement (hereinafter Employment Agreement). The Employment Agreement is attached hereto as Exhibit C.

25.     The Employment Agreement provides that Thrivent "will compensate the Managing Partner for the performance of his or her duties as a managing partner

in accordance with the terms and provisions of the Society's Managing Partner Compensation Memo."

26.     The Managing Partner Compensation Memo provides that Thrivent "may fix and determine the amount, extent, and conditions of any bonuses, awards, prizes, and allowances from time to time in its discretion."  The Managing Partner Compensation Memo is attached hereto as Exhibit D.

27.     On or about July 16, 2002, Thrivent issued a memorandum to all Managing Partners which detailed a PC Growth Bonus which Managing Partners were eligible to receive.  A copy of the memorandum is attached hereto as Exhibit E.

28.     The PC Growth Bonus consisted of four quarterly bonuses along with an annual PC Growth Bonus.

29.     Thrivent paid Mr. Boxdorfer each of the four quarterly growth bonuses which he earned.

30.     Thrivent failed to pay Mr. Boxdorfer the annual PC Growth Bonus that he earned for the 2003 year.

31.     The annual PC Growth Bonus was to be calculated by comparing sales from the previous year.  Any amount of increased revenue was to be multiplied by 1.75%.  The resulting amount was then to be paid as a bonus to each Managing Partner.

32.     The annual PC Growth Bonus was to be paid throughout 2004 year.

33.     In addition, if Tony had been properly paid his bonus he would have been eligible to receive an additional 16% payment to his pension.

## COUNT I – DEFAMATION

34.     Plaintiff incorporates paragraphs 1-33 by reference.

35.     As stated above, the Defendant made untrue and false statements to third parties.    These statements constitute Defamation Per Se as they impute misconduct as to Mr. Boxdorfer's trade and profession.

36.     These communications and misstatements were made with ill will and with the express purpose of denying Mr. Boxdorfer the opportunity for employment and subsequent competition with the Defendant.

37.     The statements were made without the belief or grounds for belief in their truth.

**WHEREFORE**, Plaintiffs, by counsel, request judgment against Defendants Thrivent Financial for monetary damages sufficient to compensate Plaintiff for his damages; interest; costs and attorney's fees; and for all other relief just and proper in the premises.


## COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

38.     Plaintiff incorporates paragraphs 1-37 by reference.

39.     The statements made by Defendant, alleged above, were made intentionally, maliciously, without just cause or excuse, and with willful intent to injure Plaintiff, sought to bring about Plaintiff's disgrace, humiliation, and ruin.

40.    The statements made by Defendant, alleged above, were extreme and outrageous under the circumstances.

41.    The statements made by Defendant, alleged above, caused Plaintiff severe emotional distress.

**WHEREFORE**, Plaintiffs, by counsel, request judgment against all Defendants for monetary damages sufficient to compensate Plaintiff for his injuries, interest; costs and attorney's fees; and for all other relief just and proper in the premises.

## COUNT III – BREACH OF CONTRACT

42.    Plaintiff incorporates paragraphs 1-41 by reference.

43.    In 2002, James Thompsen, Defendant's Vice President of Sales, contracted with all the managing partners at a managing partner meeting, promising a growth bonus if certain incentives were met.

44.    This Growth Bonus was detailed in the memorandum issued to Managing Partners, which is attached as Exhibit E.

45.    The Growth Bonus was a result of the terms of the Managing Partner Compensation Memo (Exhibit D) and Managing Partner Employment Agreement (Exhibit C).

46.    Mr. Boxdorfer set up a contest strategy for the 2003 marketing year, achieving every benchmark and earning substantial bonuses during the year.

47.    In December 2003, the Defendant paid a quarterly PC Growth Bonus payment to each of the partners who earned the bonus that quarter, including Mr. Boxdorfer.

48.     However, Defendant breached its contract and its common practices by refusing to release Mr. Boxdorfer's annual PC Growth Bonus to him, which was due January of 2004.

**WHEREFORE**, Plaintiffs, by counsel, request judgment against Defendants Thrivent Financial for monetary damages sufficient to compensate Plaintiff for his damages; interest; costs and attorney's fees; and for all other relief just and proper in the premises.

_____/s/ Philip D. Sever_____
Philip D. Sever, #25384-49
HOLLINGSWORTH, SEVER,
 STOREY & ZIVITZ P.C.
 420 N. Rangeline Road
 Carmel, IN 46032
 Phone: 317.575.9942
 Fax: 317.575.9943

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2009, a copy of the foregoing

pleading was filed electronically.  Notice of this filing will be sent to the parties by operation of

the Court's electronic filing system.


___/s/ Philip D. Sever_____
Philip D. Sever, #25384-49

**MARVIN "TONY" BOXDORFER**
1213 N. Franklin Road
Greenwood, IN  46143

May 31, 2007

<u>**Via Hand Delivery**</u>

Thrivent Financial for Lutherans

To Whom It May Concern:

Effective immediately, I am announcing my retirement as managing partner of the Indiana Regional Financial Office of Thrivent Financial for Lutherans ("Thrivent").  Please have the appropriate personnel contact me with respect to the processing of my regular and retirement benefits and compensation, including but not limited to, finalizing my compensation through the date of retirement.

To the extent that Thrivent has asserted any deficiencies in my performance, I specifically deny any such deficiencies.  To the extent that Thrivent is required by its own policy or by any regulatory policy to report the terms of my departure, I expect such reporting to reflect only that I have tendered my retirement.  I object to any reporting of any nature that is inconsistent with this characterization and will view it and respond to it as defamatory and otherwise damaging to my future employment prospects.

I have appreciated the opportunity to work with this organization and trust that any issues that arise after my retirement will be fully discussed with and disclosed to me, consistent with our long standing relationship.  Thank you.

Sincerely,

*Marvin A. Boxdorfer*

Marvin "Tony" Boxdorfer

Time of Delivery:_____3_____ p.m.
May 31, 2007

**EXHIBIT**

A

# FORM U5
# UNIFORM TERMINATION NOTICE FOR SECURITIES INDUSTRY REGISTRATION

**U5 - FULL**
**06/29/2007**

Rev. Form U5 (10/2005)

## NOTICE TO THE INDIVIDUAL WHO IS THE SUBJECT OF THIS FILING

*Even if you are no longer registered you continue to be subject to the jurisdiction of regulators for at least two years after your registration is terminated and may have to provide information about your activities while associated with this firm. Therefore, you must forward any residential address changes for two years following your termination date or last Form U5 amendment to: CRD Address Changes, P.O. Box 9495, Gaithersburg, MD 20898-9495.*

## 1. GENERAL INFORMATION

| First Name: | Middle Name: | Last Name: | Suffix: |
|---|---|---|---|
| MARVIN | ANTON | BOXDORFER | |

| *Firm* CRD #: | *Firm* Name: | *Firm* NFA #: |
|---|---|---|
| 18387 | THRIVENT INVESTMENT MANAGEMENT INC. | |

| *Individual CRD #:* | *Individual SSN:* | Individual NFA #: | Firm Billing Code: |
|---|---|---|---|
| 1585872 | 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 | | |

**Office of Employment Address**

| CRD Branch # | NYSE Branch Code # | Firm Billing Code | Address | Private Residence | Type of Office | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| 142125 | | | 9921 DUPONT CIRCLE DRIVE WEST STE 150 FORT WAYNE , IN 46825 UNITED STATES | N | Located At | 08/19/1986 | 06/01/2007 |
| 258591 | | | 243 S MADISON AVE GREENWOOD , IN 46142 UNITED STATES | N | Located At | 05/15/2006 | 06/01/2007 |

Rev. Form U5 (10/2005)

## 2. CURRENT RESIDENTIAL ADDRESS

### NOTICE TO THE FIRM

*This is the last reported residential address. If this is not current, please enter the current residential address.*

| From | To | Street | City | State | Country | Postal Code |
|---|---|---|---|---|---|---|
| 09/2002 | PRESENT | 1213 N FRANKLIN RD | GREENWOOD | IN | USA | 46143 |

EXHIBIT
B
tabbies

## 3. FULL TERMINATION

**Is this a *FULL TERMINATION*?** ⦿ Yes ○ No
Note: A "Yes" response will terminate ALL registrations with all *SROs* and all *jurisdictions*.

**Reason for Termination:** * Permitted to Resign  * Provide an explanation below

MR. BOXDORDER VIOLATED THE FIRM'S REGIONAL FIANCIAL OFFICE
ACCOUNTING POLICY AND FAILED TO REPORT CERTAIN USES OF FIRM
RESOURCES FOR UNATHORIZED PURPOSES

Rev. Form U5 (10/2005)

## 4. DATE OF TERMINATION

**Date Terminated (MM/DD/YYYY):** 06/01/2007
A complete date of termination is required for full or partial termination. This date represents the
actual date that the termination of registration is effective.

Rev. Form U5 (10/2005)

## 6. AFFILIATED FIRM TERMINATION

No Information Filed

Rev. Form U5 (10/2005)

## 7. DISCLOSURE QUESTIONS

IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IN SECTION 7 IS 'YES',
COMPLETE DETAILS OF ALL EVENTS OR PROCEEDINGS ON APPROPRIATE DRP(S). IF THE
INFORMATION IN SECTION 7 HAS ALREADY BEEN REPORTED ON FORM U4 OR FORM U5,
DO NOT RESUBMIT DRPs FOR THESE ITEMS. REFER TO THE EXPLANATION OF TERMS
SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALICIZED WORDS.

### Investigation Disclosure

|  | YES | NO |
|---|---|---|
| **7A.** Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body or *self-regulatory organization* with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigation Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page.) | ○ | ⦿ |

### Internal Review Disclosure

|  | YES | NO |
|---|---|---|
| **7B.** Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating *investment-related* statutes, regulations, rules or industry standards of conduct? | ○ | ⦿ |

### Criminal Disclosure

|  | YES | NO |
|---|---|---|
| **7C.** While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual:<br>    **1.** convicted of or did the individual plead guilty or nolo contendere ("no contest") |  |  |

in a domestic, foreign or military court to any *felony*?  ○ ◉

**2.**  *charged* with any *felony*?  ○ ◉

**3.**  convicted of or did the individual plead guilty or nolo contendere ("no contest")  ○ ◉
in a domestic, foreign or military court to a *misdemeanor involving*: investments
or an *investment-related* business, or any fraud, false statements or omissions,
wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion,
or a conspiracy to commit any of these offenses?

**4.**  *charged* with a *misdemeanor* specified in 7(C)(3)?  ○ ◉

| Regulatory Action Disclosure | | |
|---|---|---|
| | **YES** | **NO** |

**7D.** While employed by or associated with your *firm*, or in connection with events that  ○ ◉
occurred while the individual was employed by or associated with your *firm*, was the
individual *involved* in any *disciplinary action* by a domestic or foreign governmental
body or *self-regulatory organization* (other than those designated as a "*minor rule
violation*" under a plan approved by the U.S. Securities and Exchange Commission)
with jurisdiction over the *investment-related* businesses?

| Customer Complaint/Arbitration/Civil Litigation Disclosure | | |
|---|---|---|
| | **YES** | **NO** |

**7E. 1.**  In connection with events that occurred while the individual was employed by or
associated with your *firm*, was the individual named as a respondent/defendant
in an *investment-related*, consumer-initiated arbitration or civil litigation which
alleged that the individual was *involved* in one or more *sales practice violations*
and which:

    **(a)**  is still pending, or;  ○ ◉

    **(b)**  resulted in an arbitration award or civil judgment against the individual,  ○ ◉
        regardless of amount, or;

    **(c)**  was settled for an amount of $10,000 or more.  ○ ◉

  **2.**  In connection with events that occurred while the individual was employed by or  ○ ◉
associated with your *firm*, was the individual the subject of an *investment-
related*, consumer-initiated complaint, not otherwise reported under question 7
(E)(1) above, which alleged that the individual was *involved* in one or more *sales
practice violations*, and which complaint was settled for an amount of $10,000 or
more?

  **3.**  In connection with events that occurred while the individual was employed or
associated with your *firm*, was the individual the subject of an *investment-
related*, consumer-initiated, written complaint, not otherwise reported under
questions 7(E)(1) or 7(E)(2) above, which:

    **(a)**  would be reportable under question 14I(3)(a) on Form U4, if the individual  ○ ◉
        were still employed by your *firm*, but which has not previously been
        reported on the individual's Form U4 by your *firm*; or

    **(b)**  would be reportable under question 14I(3)(b) on Form U4, if the individual  ○ ◉
        were still employed by your *firm*, but which has not previously been
        reported on the individual's Form U4 by your *firm*.

| Termination Disclosure | | |
|---|---|---|
| | **YES** | **NO** |

**7F.** Did the individual voluntarily *resign* from your firm, or was the individual discharged
or permitted to *resign* from your firm, after allegations were made that accused the
individual of:

1. violating *investment-related* statutes, regulations, rules or industry standards of   ⊙ conduct?
2. fraud or the wrongful taking of property?   ⊙
3. failure to supervise in connection with *investment-related* statutes, regulations,   ⊙ rules or industry standards of conduct?

---

Rev. Form U5 (10/2005)

## 8. SIGNATURE

Please Read Carefully

All signatures required on this Form U5 filing must be made in this section.

A "Signature" includes a manual signature or an electronically transmitted equivalent. For purposes of an electronic form filing, a signature is effected by typing a name in the designated signature field. By typing a name in this field, the signatory acknowledges and represents that the entry constitutes in every way, use, or aspect, his or her legally binding signature.

8A.   FIRM ACKNOWLEDGMENT
This section must be completed on all U5 form filings submitted by the *firm*.

8B.   INDIVIDUAL ACKNOWLEDGMENT AND CONSENT
This section must be completed on amendment U5 form filings where the individual is submitting changes to Part II of the INTERNAL REVIEW DRP or changes to Section 2 (CURRENT RESIDENTIAL ADDRESS).

### 8A. FIRM ACKNOWLEDGMENT

I VERIFY THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN AND WITH THIS FORM.

**Person to contact for further information**
CHRISTOPHER KOPKA

**Telephone # of person to contact**
612-340-8240

**Signature of *Appropriate Signatory***
CHRISTOPHER KOPKA
**Signature** _____

**Date (MM/DD/YYYY)**
06/29/2007

---

Rev. Form U5 (10/2005)

### INVESTIGATION DRP

No Information Filed

Rev. Form U5 (10/2005)

### INTERNAL REVIEW DRP

No Information Filed

Rev. Form U5 (10/2005)

### CRIMINAL DRP

No Information Filed

Rev. Form U5 (10/2005)

### TERMINATION DRP

No Information Filed

Rev. Form U5 (10/2005)

## REGULATORY ACTION DRP

No Information Filed

Rev. Form U5 (10/2005)

## CUSTOMER COMPLAINT/ARBITRATION/CIVIL LITIGATION DRP

No Information Filed

THRIVENT FINANCIAL FOR
LUTHERANS

## MANAGING PARTNER
## EMPLOYMENT AGREEMENT

This Employment Agreement, effective July 1, 2002, is made by and between THRIVENT FINANCIAL FOR LUTHERANS, a fraternal benefit society and a corporation organized and existing under the laws of the State of Wisconsin ("Society"), and Marvin Boxdorfer, an individual, ("Managing Partner"), referred to collectively as the "Parties" and each referred to as a "Party." The Parties agree as follows:

### I.    CONDITIONS and DUTIES

#### A. EMPLOYMENT RELATIONSHIP.

The Society hereby employs and appoints Managing Partner as its agent to perform the duties and responsibilities described in Managing Partner's position description. This Agreement creates an employment relationship between the Parties, and does not: (1) create a legal partnership or joint venture between the Parties, or between co-managing partners; or (2) make Managing Partner a contractor of the Society. Unless otherwise specifically addressed in this Agreement, Managing Partner's employment relationship shall be governed by and subject to all applicable state and federal laws, statutes and regulations and NASD rules and regulations.

#### B. EXCLUSIVE RELATIONSHIP.

The fulfillment of this Agreement will be the principal occupation of Managing Partner and he or she will not agree to represent, or to contract with, any society, company, business, or organization, other than Thrivent Financial for Lutherans and its subsidiaries or its affiliates, except with the written consent of the Society, which consent the Society may withdraw or modify at any time.

#### C. SALES REGION.

Any sales region assigned by the Society to Managing Partner is not permanently or exclusively assigned.

#### D. PERFORMANCE STANDARDS.

The Society may establish performance expectations of Managing Partner, which may include but are not limited to fraternal activity and Regional Financial Office ("RFO") growth performance expectations.

#### E. COMPENSATION.

The Society will compensate the Managing Partner for the performance of his or her duties as a managing partner in accordance with the terms and provisions of the Society's Managing Partner Compensation Memo. Managing Partner is personally accountable to ensure that all RFO expenses are paid as set forth in the Society's policies and procedures. In case of a dispute concerning rights to compensation or any other credit under this Agreement, the decision of the Society shall be final.

#### F. BUSINESS PRACTICES and COMPLIANCE.

Managing Partner agrees to comply with all applicable laws and regulations and with the Society's rules, regulations, policies, practices, procedures and instructions, including but not limited to, information sharing practices and procedures for safeguarding information, principles and codes of ethical market conduct, and advertising and marketing standards, as amended from time to time by the Society.

#### G. RECORDS and ACCOUNTS.

Managing Partner shall keep records and books of account of all business transacted under this Agreement in the manner and form prescribed or approved by the Society and he or she shall submit such records and books of account to the Society upon request. All books, records, documents, and correspondence kept by the Managing Partner in furtherance of his or her duties under this Agreement are the Society's property and shall be kept at Managing Partner's RFO business location during this Agreement and shall be left at that business location upon termination of Managing Partner's employment with the Society. All money collected or received by Managing Partner in furtherance of his or her duties under this Agreement shall be made payable to the Society, its subsidiary or affiliate and shall be held by Managing Partner as the property of the Society, subsidiary or affiliate until safely transmitted to the Society.

1

EXHIBIT

C

his or her possession, custody or effective control from any unauthorized access, use and disclosure and agrees to return any part or all of such property upon the request of the Society. Following termination of the Managing Partner's employment with the Society, the Managing Partner agrees to certify to the Society in writing that his or her obligation to return property under this subsection has been completed. "Customers" means members, customers, clients and/or prospects of the Society or any of its subsidiaries or affiliates.

## III. CONFIDENTIAL INFORMATION, NON-REPLACEMENT and NON-RECRUITMENT

### A. CONFIDENTIAL INFORMATION.

Managing Partner agrees that, during his or her employment with the Society and for a period of one (1) year immediately following termination of such employment, Managing Partner will not directly or indirectly use or disclose any Confidential Business Information. Managing Partner agrees that his or her obligations under this subsection will equally apply to Confidential Business Information which is in the Society's possession and which may be conceived, originated, discovered or developed by Managing Partner, whether Managing Partner has any such Confidential Business Information in his or her memory or embodied in written, electronic or other form. Nothing in this Agreement will limit in any way the additional protections of the Society's trade secrets available under any applicable law. "Confidential Business Information" means all information which is not readily available to or generally ascertainable by the public, and which has limited disclosure within the Society or which is treated or designated as Confidential Business Information by the Society, the disclosure of which would be harmful to the interests of the Society. Confidential Business Information may consist of information including, but not limited to, professional matters (such as records of assets of Customers of the Society, information regarding Customers disclosed to the Society by such Customers, lists of Customers of the Society, Customer files prepared by or for the Society), financial matters (such as service costs and pricing or profit margins), and business information relating to the Society's financial arrangements or business plans (such as new products, product performance, processes and

plans for product development, and marketing, services or promotions). Managing Partner's obligations under this subsection apply to, and are intended to prevent, the direct or indirect disclosure of Confidential Business Information to others where such disclosure would reasonably be considered to be useful to the Society's competitors, or to a third party to become a competitor, based in whole or in part on such disclosure of Confidential Business Information. The Parties agree that Managing Partner's obligations under section III of this Agreement are intended to protect the Society's Confidential Business Information and business interests.

### B. NON-REPLACEMENT.

Managing Partner agrees that, during his or her employment with Society and for a period of one (1) year immediately following termination of such employment, Managing Partner will not take any action that would cause or attempt to cause or influence a Restricted Society Client to terminate, replace, surrender or cancel any Society Product. This includes, without limitation, any action taken by Managing Partner personally or through others under his or her supervision or direction. A "Society Product" is a product, contract, account or service sold or provided by or through the Society or its affiliates, subsidiaries or its or their predecessors regardless of whether the product, contract, account or service was produced by the Society, its predecessor or a third party. A "Restricted Society Client" is the owner or recipient of a Society Product which owner or recipient is assigned within Managing Partner's RFO sales region at the time Managing Partner's employment with the Society terminates.

### C. NON-RECRUITMENT.

Managing Partner agrees that, during his or her employment with the Society and for a period of one (1) year immediately following termination of such employment, Managing Partner will not entice, or attempt to entice, any employee, representative or sales agent to terminate his or her relationship with the Society or its subsidiaries or affiliates, or to become associated with or employed by another person, firm or entity engaged in a business competitive with that conducted by the Society, its subsidiaries or affiliates.

3

D. CONSIDERATION.

Managing Partner acknowledges and agrees that this Agreement is good and valuable consideration for his or her obligations under this section and that he or she has received other good and valuable consideration in exchange for this Agreement.

## IV.   GENERAL PROVISIONS

### A. MEMBERSHIP.

Managing Partner must be a benefit member of the Society. Failure to maintain such membership will result in the termination of Managing Partner's employment with the Society.

### B. PRIOR AGREEMENTS.

This Agreement supercedes, replaces and is in lieu of all previous agency agreements between the Society or its predecessors and Managing Partner, including but not limited to all management and sales agency agreements and compensation arrangements other than commissions for personal production. It is understood, however, that all obligations to the Society previously incurred or assumed by Managing Partner, and liens created in connection with those obligations, still exist, and his or her right to personal production sales commissions earned previously, if any, upon contracts or accounts personally sold by Managing Partner under prior agreements, is not impaired.

### C. SECURITY INTEREST.

Managing Partner hereby grants the Society a paramount and prior lien upon any compensation payable under or as a result of this or any previous agency agreement and under all agreements that amend or supplement this Agreement, as security for the payment of any claim or reimbursement whatsoever due or to become due to the Society from Managing Partner. Any sums becoming due to Managing Partner at any time may be applied, directly, by the Society to the liquidation of any obligation of Managing Partner to the Society, or any of its subsidiaries or affiliates, but the failure to so

apply any sum will not be deemed a waiver of the Society's lien on any other sums becoming due nor impair its right to so apply such sums.

### D. INDEMNITY.

Managing Partner will indemnify and save the Society harmless from any and all expenses, costs, causes of action and damages resulting from or growing out of Managing Partner's unauthorized acts or transactions, or his or her violation of this Agreement.

### E. ASSIGNMENT.

This Agreement is personal to Managing Partner and neither this Agreement nor any of the rights, duties or interests under this Agreement may be assigned, delegated or transferred by Managing Partner without the prior express written consent of the Society. The Society may assign or otherwise transfer this Agreement or any of the Society's rights, duties or interests arising under this Agreement.

### F. NONWAIVER.

The failure of the Society to insist upon strict compliance by Managing Partner with any of the provisions of this Agreement, whether continuing or not, shall not be construed as a waiver of the Society's rights or privileges under this Agreement. No waiver of any right or privilege of the Society arising from any default or failure of performance by Managing Partner will affect the Society's rights or privileges in the event of a further default or failure of performance.

### G. SEVERABILITY.

In the event any court determines that any portion of this Agreement is unlawful, overbroad or unenforceable in any respect, the unlawful, overbroad or unenforceable portion of the Agreement shall be modified to the extent permitted by law to make it fully lawful, valid and enforceable; and, whether modification is permitted by law or not, the remainder of this Agreement shall continue to be valid and in force, even if a portion is held to be invalid.

4

## H. OBLIGATIONS AFTER TERMINATION.

Both Managing Partner's and the Society's rights and obligations, which extend beyond the termination of this Agreement, shall survive the termination of Managing Partner's employment and this Agreement, and shall remain in full force and effect.

Dated this 25 day of June , 2002.

Marvin Boxdorfer, Managing Partner

.THRIVENT FINANCIAL FOR LUTHERANS

By

5

## MANAGING PARTNER COMPENSATION MEMO

To:      Tony Boxdorfer
From:   Thrivent Financial for Lutherans
Date:    June 20, 2002 (Effective as of July 1, 2002)
Cc:       Doug Ahrenstorff

Regional Financial Office (RFO) revenue and expenses are held and managed in a Thrivent Financial for Lutherans (Society) corporate business account in the name of the RFO. Dollars available for distribution to Managing Partners as personal income are a function of the profitability of the RFO in that the excess of RFO revenue over RFO expenses is available to support Managing Partner personal income and bonuses. The Managing Partner is personally accountable to ensure that all RFO expenses are paid from this account in accordance with in the Society's policies and procedures. Managing Partner personal income will be distributed through biweekly payments and periodic bonuses.

Bi-Weekly Personal Income: Based on your RFO business plan and projected RFO revenue and expenses as developed by you and your DVP, your biweekly personal income has been established as follows:

$13,846 level amount biweekly (each payday), or % of Production Credit for the RFO.

If actual RFO performance varies from that initially projected, this biweekly payment amount can be adjusted with the approval or at the direction of your DVP. Changes to your biweekly personal income for the next year will be determined on the basis of next year's RFO business planning process. A new compensation memo will be issued at that time to reflect any changes.

Managing Partner Bonuses: If RFO net revenue exceeds that initially projected, you are eligible for bonus payments. Such bonuses can be paid at periodic intervals or at the end of the calendar year with the approval of your DVP.

For the period of July 1 – December 31, 2002, RFO revenue dollars in excess of expenses incurred will be distributed to the Managing Partner(s) as year-end bonuses (to be paid in January 2003.)

Compensation for Personal Sales:  The Society will also compensate you for personal sales in accordance with the schedule of commissions and vesting, if applicable. The Society may at its option change the schedule of commissions and vesting as it applies to business produced after such change. The Society may fix and determine the amount, extent, and conditions of any bonuses, awards, prizes and allowances from time to time in its discretion. Except as otherwise specifically provided by the Society, you must be employed with the Society at the time of payment or award of any bonus, award, prize or allowance in order to be eligible to receive such a payment.

In case of a dispute relative to the rights to compensation or any other credit under your Managing Partner Employment Agreement or this Compensation Memo, the decision of the Society shall be final.

Reviewed By Managing Partner:  (Initial) _MAB_     (Date) 6-25-02

Reviewed By DVP: (Initial) _DA_     (Date) 7-24-02

EXHIBIT
D

**Thrivent Financial for Lutherans™**

The union of AAL and LB

4321 N. Ballard Road, Appleton, WI 54919-0001
Phone: (800) 225-5225 • E-mail: mail@thrivent.com • www.thrivent.com

July 16, 2002

To: Managing Partners
From: Field Personnel Department

Subject: 2003 RFO Transitional Compensation

Dear Managing Partner:

Thrivent Financial for Lutherans has now finalized the 2003 RFO Transitional Compensation plan. Details of the plan are outlined below. These details will help you as you plan for your 2003 RFO budgeting.

### 2003 RFO REVENUE
RFO Revenue will be calculated using:
- Proprietary PC times 30% (27% + 3% if there are senior partners or partners in place – for the purpose of this communication, we'll refer to a total of 30%.)
- Plus actual brokerage (Non-proprietary) PC generated times 20% (17% + 3% if there are senior partners or partners in place – for the purpose of this communication, we'll refer to a total of 20%.)
- Plus two special transition bonuses that are defined below:

**1. Staffing bonus (New Associate Fees – Year 1):**
- Based on associates who are in their first year since hire
- Pays greater fees on those associates' production over their PC threshold
- Paid bi-weekly
- This is part of the 2004 RFO revenue contract that is being implemented one year early.

| Contract Year | Fees up to Threshold | Threshold* | Fees over Threshold |
|---|---|---|---|
| 1 | 35% | 10,000 | 115% |

* Threshold is based on PC's from proprietary sales and accumulated since hire.



EXHIBIT
tabbies
E



**Thrivent Financial for Lutherans**™

4321 N. Ballard Road, Appleton, WI 54919-0001
Phone: (800) 225-5225 • E-mail: mail@thrivent.com • www.thrivent.com

The union of AAL and LB

## 2. PC Growth bonus:

Pay is based on the RFO's 2003 YTD Proprietary PC results compared to the RFO's baseline Proprietary PC* measured through the end of each quarter. Bonus payments will be calculated and delivered as follows:

> March 31, 2003: Actual Proprietary PC Jan. – March 2003 minus ¼ of PC baseline times 60% bonus rate. Payment will be made in April, 2003.
>
> June 30, 2003: Actual Proprietary PC Jan. – June 2003 minus ½ of PC baseline times 40% bonus rate. Payment will be made in July 2003.
>
> September 30, 2003: Actual Proprietary PC Jan. – September 2003 minus ¾ of PC baseline times 25% bonus rate. Payment will be made in October 2003.
>
> December 31, 2003: Actual Proprietary PC Jan. – December 2003 minus full PC baseline times 15% growth bonus rate. Payment will be made in January 2004.

In addition to the 2003 transitional PC Growth Bonus, we will calculate and pay your RFO's first annual PC growth bonus that is part of the 2004 RFO revenue contract. This growth bonus calculation will be similar to the December 31, 2003 transitional PC growth bonus. It will be calculated as Actual Proprietary PC Jan. – December 2003 minus full PC baseline times 175% growth bonus rate. Payment will be made throughout 2004.

\* Baseline PC is the greater of 2001 or 2002 RFO Proprietary PC.

Footnote: The PC measure and threshold amounts shown in this document are for illustrative purposes only. In 2003, we will have a new production measure which will be different from the current PC or SC measures. Based on that new production measure, an equivalent threshold level will be set for the transitional staffing bonus. Production results from 2001 and 2002 will also be converted to the new 2003 production measure to re-establish the production baselines necessary to calculate the growth bonus. Finally, the percentage fees will change when the production measure changes to result in an equivalent revenue stream for similar production.

For more information on the 2003 RFO Transitional Compensation Plan, contact your Divisional Vice Presidents or your Field Operations Consultants, Joe Nickel, 612-752-3345, or Terry Simmons, 612- 340-4131.

cc    Jim Thomsen, Doug Ahrenstorff, Doug Miller, Tom Schinke, Bryan Stoltenberg